**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MITSUBISHI CORPORATION,                )
                                        )
       Plaintiff,                      )
                                        )
vs.                                     )
                                        )
GOLDMARK PLASTIC COMPOUNDS,             )
INC., GOLDMARK PLASTICS                 )
INTERNATIONAL, INC., GPC PLASTIC        )     2:02cv1975
SALES CORPORATION; STANLEY R.           )     **Electronic Filing**
GOLDMARK; and KENNETH GROSS,            )
                                        )
       Defendants/                     )
       Counterclaim Plaintiffs,        )
                                        )
vs.                                     )
                                        )
MITSUBISHI CORPORATION,                 )
ARISTECH CHEMICAL CORPORATION           )
and SUNOCO, INC.,                       )
                                        )
       Counterclaim Defendants.        )

**O P I N I O N**

CERCONE, D.J.

      Plaintiff Mitsubishi Corporation ("MC") commenced this action seeking redress for

Goldmark Plastic Compounds, Inc.'s ("Goldmark Plastic") failure to satisfy a promissory note

and to establish Goldmark Plastics International, Inc., GPC Plastic Sales Corporation, Stanley R.

Goldmark and Kenneth Gross's (collectively "the Goldmark parties") liability for the unsatisfied

debt pursuant to "guarantee" and corporate subordination agreements assertedly securing the

promissory note. Defendants joined Aristech Chemical Corporation ("Aristech") and Sunoco,

Inc., ("Sunoco"), and asserted counterclaims against MC, Aristech and Sunoco. Presently before

the court are motions for summary judgment by MC, the Goldmark parties and Aristech/Sunoco.

For the reasons set forth below, Aristech/Sunoco's motion will be granted in part and MC and

the Goldmark parties' motions will be denied.

Federal Rule of Civil Procedure 56 (c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is

2

colorable or lacks sufficient probative force summary judgment must be granted. <u>Anderson</u>, 477 U.S. at 249-50; <u>see</u> <u>also</u> <u>Big Apple BMW, Inc. v. BMW of North America</u>, 974 F.2d 1358, 1362 (3d Cir. 1992), <u>cert</u>. <u>denied</u>, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to the Goldmark parties establishes the background set forth below. Goldmark Plastic is in the business of selling raw materials used to manufacture plastic goods. One of the raw materials is polypropylene. Goldmark Plastic developed a business relationship with Aristech in approximately 1977 for the supply of polypropylene.

On March 17, 1998, Goldmark Plastic entered into a supply contract with Aristech for the purchase of raw materials, including polypropylene ("the March 1998 Agreement"). Section 9 of the March 1998 Agreement afforded Goldmark Plastic payment terms for purchased polypropylene, and obligated Goldmark Plastic to make payment "net 45 days from shipment date." Goldmark Plastic failed to make timely payments to Aristech under the March 1998 Agreement. By the early months of 2001 Goldmark Plastic owed approximately $2.8 million for past purchases of polypropylene.

MC owned Aristech when it entered into the March 1998 Agreement with Goldmark Plastic. MC sold Aristech to Sunoco effective January 1, 2001. After the sale, Aristech would only sell polypropylene to Goldmark Plastic for "cash in advance."

On February 27, 2001, Goldmark Plastic signed a promissory note to Aristech and/or Sunoco in the amount of $2,851,473.05. On that same date Kenneth Gross, Stanley Goldmark, Goldmark Plastic and certain related corporations signed "guarantee" and "subordination" agreements. Goldmark Plastic continued to purchase polypropylene from Aristech on a "cash in advance" basis after the promissory note was executed.

Goldmark Plastic made weekly payments in accordance with the promissory note through

3

April 3, 2002. Sunoco received payments totaling $2,458,463.28, inclusive of interest at 9.5% per annum, between February 27, 2001 and April 3, 2002. Goldmark Plastic discontinued making payments at that time, leaving an unpaid balance as of April 3, 2002, in the amount of $554,907.37.

MC settled the unpaid balance on the note with Sunoco. On July 26, 2002, Aristech and Sunoco assigned it's claims/rights under the promissory note, subordination agreement and guarantee agreements to MC. MC commenced the instant action to collect the unpaid balance on the promissory note plus appropriate interest.

A central area in dispute is Goldmark Plastic's contention that it may recover damages for lost profits pursuant to its counterclaims against Aristech and Sunoco. Goldmark Plastic claims that it suffered damages after February 27, 2001, when Aristech and Sunoco failed to (1) reinstate the terms of credit under the March 1998 Agreement as the promissory note was paid down and (2) resume supplies of polypropylene at pre-2001 levels. The failure to honor the credit terms under the March 1998 Agreement after the February 27, 2001, promissory note and related instruments were executed purportedly caused a massive failure in the delivery of polypropylene, for which Goldmark Plastic seeks lost profits.

In support of the above, the Goldmark parties maintain that the March 1998 Agreement was never modified or terminated. Thus, Goldmark Plastic asserts it was entitled to receive polypropylene from Aristech pursuant to the terms of the March 1998 Agreement, which extended to Goldmark Plastic the ability to pay for materials received "net 45 days from shipment date." Aristech and Sunoco's refusal to abide by these terms after February 27, 2001, purportedly resulted in a massive failure to deliver materials, resulting in substantial losses. Consequently, the Goldmark parties maintain that they may pursue all lost profits and consequential damages resulting from these defendants' conduct.

Aristech and Sunoco maintain that any attempt to recover lost profits is precluded as a matter of law. Specifically, they contend that a limitation of remedies provision in the March

4

1998 Agreement limits Goldmark Plastic's remedy for any alleged failure to deliver and eliminates liability against either party for loss of use or lost profits.

The March 1998 Agreement provides in pertinent part:

> Aristech's maximum liability and Goldmark's exclusive remedy for any cause of action arising out of this contract, including negligence, breach of contract or strict liability in tort, is expressly limited, at Aristech's option, to replacement of or reimbursement of up to the purchase price of the Product with respect to which damages are claimed, whether such claim is in respect to Product delivered or failure of Product delivery. As a condition of any Product refund or replacement, Goldmark shall give Aristech written notice of claim within thirty (30) days of receipt of Product by Goldmark.

> Neither party shall be liable to the other for the loss or use of profit or any other special, incidental, consequential, indirect, exemplary, punitive or similar damages regarding any cause of action arising out of this contract.

March 1998 Agreement at ¶ 17. Aristech and Sunoco contend that the above provision precludes all forms of lost profits sought by the Goldmark parties in their counterclaim.

The Goldmark parties argue that the limitation of remedies provision was drafted to apply only to particular shipments of polypropylene, and not to the contract as a whole. They argue that it would be impossible for them to give the mandatory thirty (30) day notice for materials that were never received and Aristech would not have been able to replace or reimburse the purchase price of thousands of tons of material that was never received. Thus, from their perspective the limitation of damage remedy was intended to apply only to particular non-conforming shipments, and not to an extreme failure to deliver.

The March 1998 Agreement limits Goldmark Plastic's remedy for any alleged failure to deliver and liability against Aristech and /or Sunoco for loss of use or lost profit is expressly barred. Under Pennsylvania law parties may enter into an agreement that provides for an exclusive remedy in the event of non-performance or breach. <u>Jim Dan Inc., v. O.M. Scott & Sons Co.</u>, 785 F. Supp. 1196, 1198 (W.D. Pa. 1992) (under § 2715 of the Pennsylvania Uniform Commercial Code, contracting parties may enter into an agreement that provides for remedies or limits or alters the measure of damages recoverable); <u>Royal Indemnity Co. v. Security Guards,</u>

Inc., 255 F. Supp.2d 497, 502 (E.D. Pa. 2003) (unlike exculpatory clauses that are subject to strict construction limitation of liability clauses are recognized under Pennsylvania's common law and are construed pursuant to the general rules applicable to contract interpretation); Valhal Corp. v. Sullivan Associates., 44 F.3d 195, 202-03 (3d Cir. 1995) ("limitation of liability clauses are routinely enforced under the Uniform Commercial Code when contained in sales contracts negotiated between sophisticated parties and were no personal injury or personal property damage is involved" and they are also upheld in contracts governed by common law). Such clauses are frequently used to allocate unknown and undeterminable risks, and are a fact of everyday business and commercial life. Valhal Corp., 44 F.3d at 204. Thus, "so long as the limitation which is established is reasonable and not so drastic as to remove the incentive to perform with due care, Pennsylvania courts uphold the limitation." Id.

As a general matter an exclusive remedy clause will be enforceable if three conditions are satisfied: (1) the parties clearly agreed that the remedy is exclusive; (2) the remedy did not fail of its essential purpose; and (3) the limitation was not unconscionable. Jim Dan, Inc., 785 F. Supp. at 1198. To be enforceable, the clause must clearly provide that the limited remedy is an exclusive remedy. Posttape Assoc. v. Eastman Kodak Co., 537 F.2d 751, 756 (3d Cir. 1976). Where the parties seek to allocate commercial risks among themselves through such a clause, an exclusive remedy provision operates exactly as it is intended and does not fail of its essential purpose. Id.; see also Jim Dan, Inc., 785 F. Supp. at 1199. Finally, the determination of whether a limitation of remedy clause is unconscionable is dependent upon the setting, purpose and effect of the transaction. Jim Dan, Inc., 785 F. Supp. at 1200. If the loss in question is commercial economic damages, a limitation of remedy clause is prima facia conscionable. The clause in question passes each of these requirements with ease.

First, the remedial limitation clause was conspicuously integrated into the March 1998 Agreement. It was contained in a separate paragraph that shared equal prominence with all other paragraphs of the agreement. The parties expressly agreed that the limitation was "the only

remedy" available with respect to damages claimed from the supply of any product under the agreement, "whether such claim is in respect to Product delivered or <u>failure of product delivery</u>." Thus, the limitation of remedy was in a conspicuous place and indicated it was the exclusive remedy for defective deliveries or the failure to deliver in general. <u>Compare</u>, <u>Posttape Assoc.</u>, 537 F.2d at 756 (to be clear, a limitation of remedies clause must be in a conspicuous location and indicate that the limited remedy is an exclusive remedy); <u>Jim Dan, Inc.</u>, 785 F. Supp. at 1199-1200 (where limitation clearly and plainly states  it was the only remedy available in a manner that a reasonable person could certainly understand, the clause is expressly and clearly stated as a matter of law) (citing <u>Earl Brace & Sons v. Cida-Geigy Corp.</u>, 708 F. Supp. 807 (W.D. Pa. 1989) & <u>Florida Power & Light v. McGraw Edison Co.</u>, 696 F. Supp. 617 (S.D. Fla. 1988), <u>aff'd</u> 875 F.2d 873 (11th Cir. 1989)).

The limitation of remedy clause also does not fail of its essential purpose.  The existence of unknown and undeterminable risks between experienced commercial entities  provides a reasonable basis for the parties to agree to an exclusive remedy and justifies the use of such a clause.  It is precisely for these reasons that commercial entities mutually limit or exclude lost profits or other forms of consequential damages that cannot be calculated or foreseen under the long term performance of an open-ended supply agreement.  "In such cases, a limited remedy operates exactly as intended and does not fail of its essential purpose." <u>Jim Dan, Inc.</u>, 785 F. Supp. at 1199.

Here, the parties endeavored to provide Goldmark Plastic with minimum supplies of certain products in 1998 and 1999 and as thereafter renegotiated, including minimum production levels of polypropylene from certain specified plants.  Prices were set as those in effect at the time of the order.  Goldmark Plastic was granted a limited right to use Aristech's trademarks and trade names in its distribution and resale of the products received.  It also received technical service support to assist in its business development.  Adverse business events from a variety of sources could have had an impact on either of the performing parties, which in turn could have

7

created additional consequences for the other party. In carrying out the agreement the parties understood that each order would be initiated by a purchase order requesting products at agreed upon prices. Under these circumstances the exclusive remedy clause cannot be said to have failed of its essential purpose. To the contrary, it achieved exactly what it was designed to do: if there was a failure to fulfill a particular order on any specific occasion or the failure to meet minimum quantities in any particular year, the means and amount of remedying the breach were readily ascertainable.

Third, enforcing the agreement as written does not produce an unconscionable result. In determining whether a clause is unconscionable, the clause is to be considered in light of the general commercial background and needs of the industry in question. 13 Pa. C. S. § 2302 comment 1. And matters pertaining to the commercial setting, purpose and effect of the clause are relevant. 13 Pa. C. S. § 2302(b). When the loss at issue is commercial, a limitation of remedy clause is not prima facia unconscionable. 13 Pa. C. S. § 2719(c).

A commercial contract will rarely be found to be unconscionable. Stanley A. Klopp, Inc. v. John Deere Co., 510 F. Supp. 807 (E.D. Pa. 1981), aff'd, 676 F.2d 688 (3d Cir. 1982). This is because the doctrine of "unconscionability is to prevent oppression and unfair surprise, not to disturb the allocation of risks on the grounds of superior bargaining power." Jim Dan, Inc., 785 F. Supp. at 1200 (citing Stanley A. Klopp, Inc., 510 F. Supp. at 810 & § 2302 comment 1). Mere unequal bargaining power between the parties is not sufficient to make a provision of a commercial contract unconscionable. Id. And absent an allegation of fraud or incompetence, the law presumes that an individual in such a setting read and understood the provisions of the contract before agreeing to its terms. Id.

The lions share of damages sought in Goldmark Plastic's counterclaims consist of lost profits. This is precisely the type of liability the parties agreed could not be straddled on the other "regarding any cause of action arising out of [the] contract," regardless of whether it was founded in contract or tort and regardless of the source of the breach: defective delivery or no

8

delivery; failure to accept conforming goods; or failure to pay for accepted goods. A massive failure to deliver is nothing more than the "failure of product delivery" on a number of occasions over time. And while prolonged failure of product delivery might relieve Goldmark Plastic of complying with the thirty day notice requirement under appropriate circumstances, it cannot be said that such a breach was beyond the contemplation of parties who were allocating risks arising from the commitment to provide 85% of the supply of polypropylene from two designated production plants. In such a setting a massive disruption in supply (the unanticipated idling of one plant for example) would have been a breach squarely within the contemplation of the parties. Under these circumstances the limitation clause is not one-sided and "Section 2719(c) cannot be used to relieve an experienced merchant of the misfortunes of his ... poor business practices." Jim Dan, Inc., 785 F. Supp. at 1201 (citing Argo Welded Products, Inc. v. J.T. Ryerson Steel & Sons, Inc., 528 F. Supp. 583, 593 (E.D. Pa. 1981)).

Finally, the exclusive remedy clause does not run afoul of the policy disfavoring provisions which effectively immunize parties from liability. Pennsylvania courts routinely uphold limitation of liability clauses where they are "reasonable and not so drastic as to remove the incentive to perform with due care." Valhal Corp., 44 F.3d at 204. Where there is a reasonable allocation of risk between two sophisticated parties, a limitation of remedies clause will be enforced except where the clause effectively negates or drastically minimizes a party's concern for the consequences of a breach.

Here, the clause provides an exclusive remedy for any breach by the supplying party and reciprocally limited both parties' ability to recover lost profits, consequential damages and all similar forms of damage under any cause of action that might arise. In exchange, the purchasing party was promised certain levels of supply as specified and as negotiated. As long as the parties continued to perform under the agreement, Goldmark Plastic was provided with a guaranteed level of minimum supply of numerous products along with the right to distribute them under the supplier's trademarks. Goldmark Plastic was guaranteed these minimum levels of supply at the

9

going price at the time of order. The continuation of this mutually beneficial relationship was dependent upon satisfactory performance by the supplier and the purchaser. The terms of the specific transactions were known in advance. Following any material breach either party would be free to terminate the agreement and take their business elsewhere. Under these circumstances the limitation of remedy is a reasonable allocation of risk between sophisticated parties that did not remove the incentive to perform with due care. Accordingly, the exclusive remedy clause does not improperly immunize any party from liability and must be enforced as clearly and unequivocally written.

The parties also vigorously dispute whether the March 1998 Agreement was terminated or modified by the transactions in January and February of 2001 and/or the parties' course of performance thereafter. The Goldmark parties argue that the term providing Goldmark Plastic with forty-five (45) days of open credit from the receipt of shipment was never rescinded, nor was the March 1998 Agreement terminated pursuant to its express terms. Thus, the Goldmark parties contend that Goldmark Plastic retained the right to receive shipments on credit and the personal guarantee and subordination agreements executed by the Goldmark entities, Stanley Goldmark and Kenneth Gross are unenforceable for want of consideration. Aristech and Sunoco argue that the March 1998 Agreement was never modified and the Goldmark parties' attempt to assert counterclaims based on the failure of Aristech and Sunoco to extend credit and resume prior levels of supply after February 2001 are independent oral contracts for the sale of goods in excess of $500 that are unenforceable under the Uniformed Commercial Code's ("UCC") Statute of Frauds.

The March 1998 Agreement was never terminated. Pursuant to its express terms, the agreement was to run through December 31, 1999, and continue thereafter until either party provided six months written notice of termination "effective December 31, 1999 or December 31 of any following year." March 1998 Agreement at ¶ 5. Written notice of termination was never tendered by Aristech or Goldmark Plastics. Aristech and Sunoco do not contend that the

10

transactions in January and February of 2001 constituted a reputiation of the March 1998 Agreement. Except for a change in the terms of credit and a corresponding decrease in the volume of supply, the parties' post February 2001 course of dealings were consistent with the terms and condition of the March 1998 Agreement. It follows that the March 1998 Agreement remained effective during the parties' entire course of dealings.

Nevertheless, the Goldmark parties' contention that the term of open credit made available to Goldmark Plastic in the March 1998 Agreement continued to be effective when the promissory note, personal guarantees and subordination agreement were executed in January and February of 2001 is unavailing. The parties have stipulated that "the March 17, 1998 agreement between Aristech Chemical Corporation and Goldmark Plastic Compounds, Inc., for the purchase of polypropylene (the "agreement") was never modified by any writing." Pretrial stipulation at ¶ 7. The court agrees. While the promissory note, personal guarantees and subordination agreement clearly constitute writings that reflect the existence of a modification to the credit terms contained in the March 1998 Agreement, these instruments were never signed by Aristech as required for a modification of the March 1998 Agreement.[1] But notwithstanding the fact that the March 1998 Agreement was never modified, it is unequivocally clear that the parties' course of dealings effectuated an enforceable waiver of the previously extended terms of credit. Accordingly, the Goldmark parties' contention that the personal guarantees fail for want of consideration is unavailing.

---

[1] The March 1998 Agreement contained the following restriction on modifications:

> This document contains the entire agreement of the parties and all proposals, negotiations and representations, if any, made prior to and concerning this contract are merged herein. Any subsequent modifications to this contract must be in writing stating an intention to modify the agreement and signed by an authorized representative of Aristech.

March 1998 Agreement at ¶ 22.

It is settled that the Uniform Commercial Code changed the law with regard to oral modification of a contract that by its terms requires any modification to be in writing. J.W. Goodliffe & Son v. Odzer, 423 A.2d 1032, 1034 (Pa. Super. 1980) (citing Universal Builders, Inc., v. Moon Motor Lodge, 244 A.2d 10 (Pa. 1968)).

The UCC Section on modification, rescission and waiver provides:

(1) an agreement modifying a contract within this Chapter needs no consideration to be binding.

(2) a signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be seperately signed by the other party.

(3) the requirements of the statute of frauds section of this chapter must be satisfied if the contract as modified is within its provisions.

(4) although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3), it can operate as a waiver.

(5) a party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

13 Pa. C. S. § 2-209. Through this section the drafters of the UCC changed the common law in two ways: (1) modification to agreements for the sale of goods are enforceable without additional consideration; and (2) written agreements containing clauses prohibiting modifications unless reduced to writing were made enforceable. Green Construction Co. v. First Indemnity of America Ins. Co., 735 F. Supp. 1254, 1260 (D. N. J. 1990).[2]

---

[2]The common law did not enforce a contractual provision prohibiting oral modifications based on the "reasoning" that the parties were always free to agree orally to cancel their contract and the clause forbidding oral modifications would disappear with the rest of the contract when it was cancelled. See Wisconsin Knife Works v. National Medal Crafters, 781 F.2d 1280, 1286 (7th Cir. 1986) (Posnar, J.). As the Pennsylvania Supreme Court has explained, even "the most iron clad written contract [could] always be cut into by an accetylene torch of parole modifications supported by adequate proof." Wagner v. Graziano Construction Co., 136 A.2d 82, 83-84 (Pa.

The promissory note, personal guarantees and subordination agreement clearly constitute a writing reflecting a change in the terms of payment under the March 1998 Agreement. Goldmark Plastics was in arrears in the amount of approximately $2.8 million in January of 2001 when MC sold Aristech to Sunoco and approximately $2.4 million when the promissory note along with its accompany payment schedule of approximately $50,000 a week was executed by Aristech and Goldmark Plastic. At that time Goldmark Plastic executed a corporate guarantee which provided:

> In order to induce Aristech Chemical Corporation, Inc. and Sunoco Inc. and/or any present or future subsidiaries and affiliates, including but not limited to Sunoco Inc. (R & M), as defined under the Securities Act of 1933 (hereinafter called "Sun") to extend credit or enter into contracts and agreements with Goldmark Plastics Compound, Inc. (hereinafter designated the "Debtor"), the undersigned hereby guarantee, jointly and severely, the full and prompt payment to Sun of any indebtedness, including any accrued interest and any other liabilities and obligations of Debtor to Sun in connection with an extension of credit by Sun to or an indebtedness arising with Debtor, together with all expenses of obtaining payment thereof or enforcing the collateral security of this guarantee, including court and reasonable attorneys fees (said indebtedness, liabilities, obligations and expenses being referred herein as "such obligations").

Corporate Guarantee of February 27, 2001 at 1. The instrument was signed by defendants Stanley Goldmark and Kenneth Gross in their corporate capacities. In addition, a subordination agreement executed at the same time provided:

> This agreement is made this [27th] day of February, 2001 between Aristech Chemical Corporation and/or Sunoco Inc. (R & M) (hereinafter referred to as "Sun") and Stanley R. Goldmark and Kenneth Gross.
>
> In consideration of Aristech Chemical Corporation and/or Sunoco Inc. (R & M) extending credit to Goldmark Plastics Compounds, Inc., (hereinafter referred to as "Debtor") on open account terms and other terms as Sun may deem as appropriate to Debtor, and intending to be legally bound, the undersigned hereby subordinates to and in favor of Sun all stockholder loans granted to Goldmark Plastic Compounds, Inc., G.P.C. Plastic Sales Corp. and Goldmark Plastics International, Inc. and all security interest it has or may hereinafter acquire.

---

1957); see also Middletown Concrete Products, Inc., v. Black Clawson Co., 802 F. Supp. 1135, 1146 (D. Del. 1992) (noting changes to common law effectuated by § 2-209).

13

Subordination Agreement at 1. These agreements, while not signed by an officer of Aristech, provide clear evidence that the open terms of credit previously extended to Goldmark Plastic under the March 1998 Agreement orally had been rescinded by Aristech and Sunoco, notwithstanding the lack of a written modification of the agreement to that effect.

It is equally well-settled that an attempted modification or rescission of the terms of a written agreement for the sale of goods can be effective as a waiver even without detrimental reliance by the party that could insist on adherence to the terms of the original agreement. Double-E Sportswear Corp., v. Gerard Trust Bank, 488 F.2d 292, 295-96 (3rd Cir. 1973) (Aldisert, J.). This rule has been summarized as follows:

> A modification or rescission may be inoperative because it fails to meet the formal requirements imposed by the Statute of Frauds (if the contract, as modified, comes within the Statute of Frauds) or by a clause of the original contract, but even if this is so, the agreement may nevertheless be effective as a waiver, without regard to whether there has been reliance thereon.

Id. (quoting 1 Anderson, UNIFORM COMMERCIAL CODE, 2d Ed., § 2209:8 - Defective Modification or Rescission as a Waiver). In such a situation "reliance on a waiver becomes important only when it is sought to retract the waiver." Id. And "Section 2-209(5) permits the retraction of a waiver by reasonable notice to the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position by [the other party] in reliance on the waiver." Id. at 296; see also J. W. Goodliffe & Son, 423 A.2d at 1035 (oral change demanded in terms of written contract containing modification only in writing clause was ineffective as modification, but when carried into effect by the parties reflected "an attempt at modification" that effectuated a waiver pursuant to Section 2-209(4)); Sonfast Corp., v. York International Corp., 875 F. Supp. 1099, 1103 (M.D. Ta. 1995) (attempted oral modification precluded by statute of frauds becomes effective where the other party acquiesces in the modification and fails to provide notice of insistence upon original terms); Carlos R. Leffler, Inc., v. Hutter, 696 A.2d 157, 161 n. 3 (Pa. Super. 1997) ("the parties' attempted, oral modification is nonetheless effective as a waiver of the original contract terms

14

[despite a no oral modification clause] and, to the extent that the old and new terms conflict, the new terms control.") (citing 13 Pa. C. S. § 2-209)).

Here, Aristech and its parent company, Sunoco, attempted a modification of the credit terms in the March 1998 Agreement in January of 2001 when Sunoco acquired ownership of Aristech. The Goldmark parties acquiesced in the oral modification without objection. Stanley Goldmark and Kenneth Gross signed personal and corporate guarantees of Goldmark Plastic's indebtedness to Aristech which expressly reflected the change in payment terms attempted by Aristech and Sunoco. The parties continued to engage in transactions involving the supply and distribution of polypropylene thereafter. See e.g. Exhibit O to Goldmark's appendix in support of its opposition to the cross motions for summary judgment (Doc. No. 53). Goldmark Plastic failed to provide notification that strict performance of the credit terms in the March 1998 Agreement would be required with regard to any subsequent transaction. Consequently, the attempt of modification by Aristech and Sunoco became a waiver based on the parties' subsequent course of dealings and performance. Compare J. W. Goodliffe & Son, 423 A.2d at 1034 (attempted modification when combined with course of dealing over period of time and numerous transactions reflected a waiver within the meaning of Section 2-209(4)); Sonfast Corp., 875 F. Supp. at 1103 (same); Carlos R. Leffler, Inc., 696 A.2d at 159-61 (attempted oral modification and parties' course of performance thereafter effectuated valid waiver of implicated original contract terms notwithstanding no oral modification clause).

Once a selective waiver has occurred, there is no barrier to the oral modification of the terms of the written contract that have been waived under either the contract or the Uniform Commercial Code. Double-E Sportswear Corp., 488 F.2d at 296 & 299 (Garth, J. concurring) (noting that § 2-209(5) refers to a waiver "effecting an executory portion of the contract" and provides for "strict performance of any term waived" where reasonable notification is received and no material change of position in reliance on the waiver has occurred); 1 Hawkland, UNIFORM COMMERCIAL CODE, Series § 2-209:5 (noting that "for purposes of Section 2:209(4),

15

waiver should be largely confined to situations involving course of performance and not be allowed to rest on contested parole evidence" and such a waiver should be limited to the specific terms implicated by the course of conduct and not other unrelated terms or the entire agreement).

The parties' subsequent course of dealing indicate that Goldmark Plastic could continue to purchase polypropylene from Aristech under the March 1998 Agreement provided it paid cash in advance and Aristech and Sunoco would give reasonable and good faith consideration to reinstating Goldmark Plastic's terms of credit in exchange for timely payments under the promissory note and execution of the personal guarantees and subordination agreement. All of these terms pertained to the portion of the particular term of the written contract that was waived: Goldmark Plastic's term of credit.

Because the record clearly and unequivocally demonstrates that the Goldmark parties waived the right to insist on strict adherence to the original terms of credit in the March 1998 Agreement, their argument that the personal guarantees lacked consideration is inaccurate and unavailing.[3]

It also follows from the above that Aristech and Sunoco's requests for summary judgment on the Goldmark's parties' counterclaim at Count Four for failure "to extend credit to Goldmark Plastic as it payed down the note" and at Count Three for failure to "resume supply of Off Spec [polypropylene] at the level previously set by the March 1998 Agreement" on the basis of the

---

[3]Even assuming for the purpose of argument that independent consideration was needed for the personal guarantees, the record unequivocally reflects the existence of adequate consideration. Goldmark Plastic was in substantial arrears in February of 2001. Aristech unequivocally had the right to declare Goldmark Plastic in breach and repudiate further performance under the contract. In that event, it would no longer be obligated to sell polypropylene to Goldmark Plastic under any circumstances. Instead of exercising its right to effectuate a wholesale termination of the agreement, Aristech and Sunoco agreed to supply polypropylene to Goldmark Plastic pursuant to the March 1998 Agreement to the extent Goldmark Plastic could comply with the new term of payment. In addition, Aristech and Sunoco agreed to give reasonable consideration to re-establishing Goldmark Plastic's prior terms of credit in exchange for the personal guarantees of its debt by Stanley Goldmark and Kenneth Gross. Thus, there was more than adequate consideration for the change of payment terms and the personal guarantees executed in conjunction therewith.

statute of frauds must be denied. The alleged oral promise to extend credit to Goldmark Plastic as it payed down the note purportedly was made by a high level officer of Aristech in February of 2001 when the attempted oral modification was initiated. In addition, the March 1998 Agreement obligated Aristech to supply certain levels of product, which agreement remained effective provided Goldmark Plastic could comply with the new terms of payment and/or proves an extension of credit was unreasonably withheld following a request for credit reinstatement. These asserted aspects of the February 2001 negotiations could be proven to be part of the terms of the attempted modification aimed at rescinding Goldmark Plastic's terms of credit and the resulting waiver implementing those terms.

Sunoco's request for summary judgment on Count Three of the Goldmark parties' counterclaim likewise will be denied to the extent the Goldmark parties can establish Aristech's failure "to resume supply of Off Spec at the level previously set by the March 1998 agreement" was the result of a wrongful withholding of the extension of credit to Goldmark Plastic after it payed down the note. Sunoco correctly notes that a parent corporation generally cannot be held liable for the actions of its subsidiary. See E.G. Lumax Industries, Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995) ("there is a strong presumption in Pennsylvania against piercing the corporate veil"). And the court is required to start from the general proposition that a corporate entity must be recognized and its separate existence upheld unless specific, unusual circumstances call for an exception. Id. Mere ownership of a subsidiary does not justify the imposition of liability on a parent corporation. Such liability only is appropriate "then the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967). Liability also may be appropriate where the parent "so dominated the subsidiary that it had no separate existence." New Jersey Dep't. of Envtl. Prot. v. Centron Corp., 468 A.2d 150, 164 (N.J. 1983). Here, no such circumstances exist. Notwithstanding the lack of any basis for piercing the corporate veil, material issues of fact

17

remain as to whether Sunoco became a party to the March 1998 Agreement for purposes of determining whether credit should be reinstated to Goldmark Plastic. There is evidence in the record to support the proposition that Goldmark Plastic's credit with Aristech was expressly withheld by Aristech pursuant to directions from Sunoco. In addition, the personal guarantee agreements of Stanley Goldmark and Kenneth Gross clearly indicate that the reestablishment of credit with Aristech under the March 1998 Agreement was dependent upon the ultimate approval of Sunoco. And the Goldmark parties point out that a credit manager for Sunoco (1) negotiated the promissory note and its related documents, (2) assertedly promised to extend credit to Goldmark Plastic and resume supply at prior levels and (3) monitored and directed the financial relationship between Goldmark Plastic and Aristech thereafter. In addition, Aristech and Sunoco are named interchangeably on the note and guarantees. It follows that the finder of fact may well conclude that Sunoco became a party to the modified March 1998 Agreement for the purpose of managing the course of dealings between Aristech and Goldmark Plastic after February of 2001 and/or approving any reinstatement of credit to Goldmark Plastic under that agreement. Consequently, Sunoco's request for summary judgment on Count Three of the Goldmark parties' counterclaim must be denied to the extent plaintiff can establish at trial that there was a wrongful withholding of credit after Goldmark Plastics paid down the note and requested that credit terms be reconsidered.[4]

Stanley Goldmark and Kenneth Gross' contention that the personal guarantees objectively applied only to future credit obligations incurred after February 27, 2001, also is misplaced. In support of their position defendants Goldmark and Gross reference provisions in the personal guarantee instrument that provide that in the event of Goldmark Plastic's failure to perform or pay any indebtedness owed to Aristech and/or Sunoco, the "same shall become immediately due

---

[4]Stanley Goldmark testified that even he believed it inappropriate to request credit until the note had been substantially paid down. Whether such a request subsequently was made is unclear based on the record before the court. At this juncture the court will assume that Goldmark Plastic ultimately made such a request, and the request was denied.

and payable by [Stanley Goldmark and Kenneth Gross] ... without demand or notice in the event of any default under the credit terms of such purchase ...." They also reference the subordination agreement, which in contrast to the personal guarantees that were expressly executed "in order to induce [Aristech and/or Sunoco] to extend credit to Goldmark Plastic," provides that the agreement was executed in "consideration of Aristech Chemical Corporation and/or Sunoco Inc. (R & M) extending credit to Goldmark Plastic Compounds, Inc. (hereinafter referred to as "Debtor") on open account terms and other terms as Sun may deem appropriate...." Based on these provisions, defendants Goldmark and Gross request a ruling that the personal guarantee is phrased in terms of future obligations and the extension of credit in the future and not as a past accounting for an accrued debt. We disagree.

The personal guarantee is to be construed in accordance with New York law. In general, instruments of guarantee are governed by the rules of contract construction under New York law. Cavendish Traders Ltd. v. Nice Skate Shoes, Ltd., 117 F. Supp. 2d 394, 400 (S.D. N.Y. 2000). "More specifically, a valid guarantee must be a written instrument guaranteeing payment of another's debt, describing with precision the obligation to which the person is bound." Id. Consideration given for the guarantee must be expressly or impliedly reflected in the instrument and it must be delivered to and accepted by the guarantor. Id.

The guiding polestar in construing a guarantee is the intention of the parties as reflected in the executed instrument in light of custom and practice in the industry. Flexi-van Leasing, Inc., v. Isaias, 23 F. Supp.2d 419, 422 (S.D. N.Y. 1998). The terms of a personal guarantee are to be strictly construed in favor of the guarantor, and the guarantor cannot be bound beyond the terms of the instrument. Id. (collecting cases in support). In general, a guarantee is limited to the true transaction for which it is given and does not apply to future obligations unless the instrument "clearly imports a continuing liability." Id. (collecting cases in support). Thus, the initial question to be determined is whether the language of the guarantee indicates it was intended to apply to pre-existing debts, a particular transaction, or all debts continuing into the

future.

Here, the personal guarantee expressly applies to all of Goldmark Plastics's debts continuing into the future. First, defendants Goldmark and Gross jointly and severely guaranteed the full and final prompt payment to Aristech and/or Sunoco "of any indebtedness and any other monetary liabilities or obligations of [Goldmark Plastic] ... in connection therewith, together with all expenses of obtaining payment thereof or enforcing any collateral security or this guarantee, including court costs and reasonable attorneys' fees (said indebtedness, liabilities, obligations and expenses being referred to herein as "such obligations")" (emphasis added). Thus, the guarantee covered any indebtedness by Goldmark Plastic to Aristech and all collection expenses incurred in connection therewith. Objectively, this language necessarily encompassed any existing debt at the time the instrument was executed, which included the 2.4 million dollar promissory note that was executed on the same date.

The instrument also clearly reflected an intent that it extend to any future indebtedness as well. The instrument unequivocally stated it was "a continuing, absolute and unconditional Guarantee" that could be enforced without demand on or proceeding against the debtor or others liable for such obligations and without resorting to collateral security or other property or invoking other available rights or remedies. Thus, the instrument imposed a duty on the guarantors to satisfy any future debts. Compare Chemical Bank v. Sepler, 457 N.E.2d 714, 716 (N.Y. 1983) (expressly indicating that an instrument "is a continuing guarantee" sufficiently reflects an intent to cover post-executed obligations and "is not limited to the life of the loans executed contemporaneously therewith.") (collecting cases in support).

The personal guarantee signed by defendants Goldmark and Gross covered "any indebtedness" of Goldmark Plastic to Aristech and/or Sunoco. It also obligated them to satisfy Goldmark Plastic's debts continuing into the future. This, of course, was consistent with the reasons for and consideration given in exchange for the instrument, the good faith and reasonable consideration of reestablishing Goldmark Plastic's terms of credit with Aristech. It is also quite

20

inconsistent with the contention that the guarantee extended only to future indebtedness as opposed to both existing and subsequent indebtedness. Thus, the language used in the instrument objectively reflects a clear intent to guarantee both the existing and future indebtedness of Goldmark Plastics to Aristech and/or Sunoco, which is only reinforced by the circumstances and context in which the personal guarantee was executed. Accordingly, defendant Goldmark and Gross' request for a ruling that the personal guarantee applied only to post February 27, 2001, credit that might have been extended to Goldmark Plastic must be denied.

Finally, MC's motion for summary judgment also must be denied. MC has established that the underlying facts surrounding the execution of the promissory note, the history of payment and the failure of the Goldmark parties to make any payments after April 3, 2002, produce a remaining balance due and owing on the note in the amount of $554,907.37. These material facts are undisputed. In addition, it is uncontested that MC never entered into a contractual relationship with any of the Goldmark parties.

Notwithstanding the above, material issues of fact must be resolved before MC is entitled to any judgment. MC does not possess the note as a holder in due course. It acquired it by way of assignment from Sunoco. The assignment was executed on July 26, 2002, over 90 days after Goldmark Plastic stopped paying down the note.

"It is hornbook law that the assignee of a cause of action takes it subject to any defenses that could have been raised against the assignor." FDIC v. Ornstein, 73 F. Supp.2d 277, 281 (E.D. N.Y. 1999); Stevwing v. Western Pa. Nat'l. Bank, 359 A.2d 793, 797 (Pa. 1976). And this includes an inchoate counterclaim that matures after notice of the assignment where the claim is inherent in the transaction sought to be enforced by the assignee. In re Asset Recovery Group, 261 B.R. 825, 832-33 (Bankr. W.D. Pa. 2001).

Here, the Goldmark entities have presented counterclaims that have partially survived Aristech and Sunoco's motion for summary judgment. The record remains unclear as to whether

21

the Goldmark entities will be able to establish damages in accordance with the court's rulings set forth above. In the event they are able to do so, any resulting award would be a proper offset against the amount to which MC claims entitlement and likewise would affect any request for interest thereon. Accordingly, MC's request for summary judgment on the instruments acquired by assignment on July 26, 2002, must be denied.

For the reasons set forth above, Aristech and Sunoco's motion for summary judgement will be granted in part and denied in part, the Goldmark parties and MC's motions for summary judgement will be denied, and the court will set forth the rulings that will govern the future course of this litigation. An appropriate order will follow.

Date: **August 16, 2006**

David Stewart Cercone
United States District Judge

cc:   Matthew C. Cairone, Esquire
Cairone Law Office
941 Red Oak
Pittsburgh, PA 15238

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219

Jack B. Cobetto, Esquire
Patricia E. Antezana, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219